IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DOROTHY JEAN MARTELL,

        Plaintiff,

        v.                         Civil Action No. 2:10-CV-44

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION CLAIMANT'S MOTION FOR SUMMARY
JUDGMENT BE GRANTED IN PART AND DENIED IN PART**

**I. Introduction**

A.    <u>Background</u>

      Plaintiff, Dorothy Jean Martell, (hereinafter "Claimant"), filed her Complaint on March

31, 2010, seeking judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by

Defendant, Commissioner of Social Security, (hereinafter "Commissioner").[1] Commissioner

filed his Answer on July 1, 2010.[2] Claimant filed her Motion for Summary Judgment on August

2, 2010.[3] Commissioner filed his Motion for Summary Judgment on August 26, 2010.[4]

B.    <u>The Pleadings</u>

      1.    <u>Plaintiff's Brief in Support of Motion for Summary Judgment</u>.

      2.    <u>Defendant's Brief in Support of Judgment on the Pleadings</u>.

---

[1] Dkt. No. 3.

[2] Dkt. No. 8.

[3] Dkt. No. 11.

[4] Dkt. No. 13.

3. Plaintiff's Reply Brief.

C.      Recommendation

For the following reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **GRANTED IN PART AND DENIED IN PART** as follows: It should be **GRANTED** for a determination whether the VE's testimony is consistent with the definitions in the DOT and Claimant's limitations.  It should be **DENIED** because Claimant's RFC is reserved for the ALJ.

2.      Commissioner's Motion for Summary Judgment be **GRANTED IN PART AND DENIED IN PART** for the same reasons.

## II.  Facts

A.      Procedural History

Claimant filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on November 16, 2006, alleging disability due to asthma, emphysema, major depression, spinal problems, chronic obstructive pulmonary disease, sleeping problems and surgery on her left foot with an onset date of November 30, 2000. (Tr. 98, 110). The application was initially denied on January 19, 2007, and on reconsideration on April 17, 2007. (Tr. 57-61, 70-72).  Claimant requested a hearing before an Administrative Law Judge ("ALJ") on April 30, 2007, and received a video hearing on December 12, 2008. (Tr. 74, 79). Claimant and her attorney appeared in Hagerstown, MD, while the ALJ and a vocational expert, Dr. Andrew Beal, appeared in Richmond, Virginia. (Tr. 79).  At the hearing, Claimant amended her alleged onset date to July 30, 2002. (Tr. 13).

On June 18, 2009, the ALJ issued a decision adverse to Claimant finding that the severity

of her impairments did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525, 404.1526, 416.925 and 416.926). (Tr. 10-22). Claimant requested review by the Appeals Council on July 20, 2009, but such review was denied on January 29, 2010. (Tr. 1-5). Claimant filed this action, which proceeded as set forth above, having exhausted her administrative remedies.

B.    Personal History

Claimant was born on October 7, 1962, and was thirty-nine (39) years old on the amended onset date of the alleged disability and forty-six (46) years old as of the date of the ALJ's decision. (Tr. 98). Under the regulations, Claimant was considered a "younger individual" aged 45-49, and generally, one whose age will not "seriously affect [Claimant's] ability to adjust to other work." 20 C.F.R. §§ 404.15639(c), 416.963(c) (2010). Claimant completed high school and has prior work experience as a cook/dishwasher, a cook/server in a pizza place, a server in a donut & coffee shop, and as a sorter. (Tr. 112).

C.    Medical History

The following medical history is relevant to the issues of whether substantial evidence supports the ALJ's finding that the Claimant could perform a range of sedentary work as well as the ALJ's credibility determination relative to the Claimant:

**Dr. Courtney Struthers, 8/18/00-12/18/08 (Tr. 165-192, 324-379)**
8/18/00:
CC: is here to re-establish care; complaining of fatigue and hot flashes at night; does smoke about 1 pack/day, but recently cut down a little bit; has had tubal litigation; she is G2, P2 and has 1 living child; Mother has terrible emphysema; patient has been out of her inhalers that she has used for quite awhile.
HPI: young female appearing in no acute distress; lungs are completely clear; heart normal S1 and S2, no murmurs, rubs or gallops, abdomen-soft, non-tender; Pharynx clear, neck supple without LAD or thyromegaly
A/P: will check blood work today including FSH, thyroid functions and CBC as well as blood

sugar; would like her to have chest x-ray, but is not able to afford that at this time; would like

9/8/00:
CC: here for follow up of reestablished care visit; did previous blood work which showed normal CBC, normal basic metabolic panel, normal TSH and normal SFH which was premenopausal; still smoking heavily; extremely tearful and under a lot of stress; working 6 days a week; her 16 year old daughter dropped out of school and ran away from home; She is under some kind of legal trouble and patient says she is just beside herself; she says she went so far as to take her to the Dept of Health and Human Services to try to give her to them for foster care but they said she would be arrested for abandonment.
HPI: Tearful female, patient not sleeping; did not feel that Albuterol made the breathing much better; has no medication and no money
A/P: Severe life stressors of a 37 y.o. female; probably having some reactive depression; was referred to Darlene Muse today and then to Behavioral health; will see Claimant back as needed

11/28/00:
CC: here to follow up; claimant apparently collapsed at work back on 10/6 and has not been back to work at Taco Bell; There is some ongoing law suit; patient has been really stressed out; was seen in ER that day and evaluation only revealed stress, according to patient. Had all normal blood work here with me in August; Claimant is feeling well about her daughter but there has been other psychosocial stressors; still smoking; feels that in AM she can't breathe well and would like to use her inhaler, but Albuterol makes her too jittery
HPI: female appearing older than stated age; no acute distress; lungs are completely clear, heart norma S1 and S2, no murmurs; abdomen-soft, nontender
A/P: Has multiple psychosocial stressors; encouraged her to quit smoking; will try her on Vanceril and Atrovent inhaler to see if this decreases the shortness of breath; mother has terrible COPD and patient is at risk for this as she is still smoking

9/14/01:
CC: Here for "something for her nerves"
HPI: not been sleeping well since death of her father; patient under extreme stress according to patient's husband who is with her in the room; been trying to care for a mentally retarded family that her father used to care for before he died; patient not eating right, not sleeing, having chest, back and stomach discomfort on and off. Continues to smoke a pack a day, although trying to quit this weekend with nicotine patches, not able to work at this time, She burst into tears when starting to talk about her father
A/P: Started Claimant on Trazodone at PM which will help her sleep and as an antidepressant; asked Claimant to try to eat more regularly and to take care of herself; major intervention today is referring her to social worker to get some help for this other family so that she does not feel responsible for them; gave Claimant name of grief counselor; would like to see back in 2 weeks

10/31/01:
CC: seen her for "flu symptoms 2x weeks;" has not had any inhalers; had cough productive of thick phlegm; sometimes feels she can't get her breath when she lays down at night; felt

extremely tired; patient has been physically and mentally worn out; admits to feeling a little dizzy today

HPI: tired appearing female; no acute distress; lungs clear except for trace wheezes, abdomen soft, nontender; pharynx unremarkable; neck supple; CMP also drawn; Chest x-ray ordered

A/P: started out on Amoxicillin and her Atrovent inhaler again; asked Claimant to get a chest x-ray and drink a lot of fluids. See back if not improved.

12/7/01:

CC: follow up initiation of Zoloft for depression and anxiety, 3 weeks ago

HPI: not sleeping well, mother is in hospice dying of lung cancer and Claimant lost father earlier this year; met numerous times with our social worker and will meet again today for an extensive period

A/P: Continue taking good care of herself; Continue the Zoloft 50 mg and increase the Trazodone to 75 mg in PM; Encouraged to stay in counseling with our social worker; may also need grief counselor; see back in a few weeks

2/28/02:

CC: severe depression and grief reaction related to multiple deaths in the family recently is here for follow-up

HPI: 2 cousins have died recently of severe heart problems, Claimant has strong family history of heart blockages and is quite nervous about it; Worried about catching hepatitis B or C from husband despite husband thinking both are in remission. Claimant continues to smoke, feels nauseous quite frequently and has been under increased stress; Claimant quite tearful today over recent deaths in her family

A/P: Draw lipids and other blood work that Claimant requests including hep B and C; emphasized to quit smoking, instructed her on use of nicotine patch and some behavioral medicine techniques; refills on Atrovent, Trazodone, and Zoloft.

4/8/02:

CC: Follow-up from hospital ER visit for chest pain; had chest pains on and off for the last several months; felt around left breast and left shoulder, across the trapezius; meeting with Dr. Donahue on regular basis for grief counseling

HPI: Lungs clear, heart normal S1 and S2 with no murmurs, rubs, or gallops; trapezius on the left has marked muscle spasm and some triger points; some marked chest wall tenderness along left costochondral cartilage under left breath; extremities have no edema

A/P: Under immense stress with probable musculoskeletal chest and upper back pain; started on Naprosyn and Flexeril and advised to do some exercises from neck booklet; has chronic problem acid reflux so given slip for Protonix today; plan on doing outpatient stress test

4/29/02:

CC: follow-up of left shoulder pain; results of stress test

HPI: Mood is quite upbeat today, patient tends to be either one or the other, quite upbeat or depressed; taken in husband's nephew who has some behavioral problems; shoulder is nontender, has much better range of motion; stress test reviewed w/patient, was symptomatically

negative; Claimant had good effort; heart rate and blood pressure response was normal
A/P: Work on quitting smoking; wear nicotine patch; continue the Naprosyn and Flerixil; meet with social worker

9/25/02:
CC: history of asthma and significant depression..here for follow-up; attempted suicide on July 30th with drug overdose and alcohol-hospitalized at City Hospital; experienced 6 deaths in her family over past year. Feels she is doing better though; had to use Atrovent inhaler a lot; sees counselor on weekly basis
HPI: Lungs completely clear; pharnyx cobblestoning; nares swollen, friable, TM, clear
A/P: Continued smoking refill given on her Atrovent; also to try Allegra 180 mg; flu shot given today; depression-continue current therapy and counseling

11/4/02:
Patient did not keep appointment

1/29/03:
CC: follow-up of asthma, smoking, and mostly for severe left shoulder pain that has been building up since accident over summer of 2002; is a dull ache all day long, along backside of her left shoulder; it occasionally makes her left arm tingle and feel numb; occasionally gets sharp to severe pain. Still smoking, and had suicide attempt in early fall; all teeth were extracted and will get dentures
HPI: Mouth is edentulous, gums are healing well; no spasm along upper part of trapezius but long the mid, on the back of scapula there is a lot of pain and spasm. No pain to palpation at rotator cuff and has good range of motion of left shoulder; deep tendon reflexes are at biceps and are slightly more prominent on left than right arm; normal motor strength; lungs are clear
A/P: Left shoulder pain and spasm. Given some samples of Vioxx 50 mg qd#8; prescribed Flexeril 10 mg #30; may use heat on shoulder

2/10/03:
CC: Continued left shoulder pain and "knots," muscle spasms so tight that Claimant cries; started to improve but after she helped her friend move, it started hurting again
HPI: Shoulder has very good range of motion, most of her pain is in trapezius in the back; had normal stress test last year
A/P: Continued musculoskeletal left shoulder pain. She is to use heat on it; refilled Flexeril to use 3x/day and went back to Naprosyn; encouraged not to overuse it, but to gently move the shoulder throughout the day.

11/20/03:
CC: Asthma, possible COPD, Slight discomfort in left chest only if she takes a real deep breath; has slight daily cough which she attributes to smoking, is on Paxil and getting some counseling and is doing much better overall
HPI: Lungs clear bilaterally, breath sounds overall are slightly diminished, Heart is regular with no murmers, pharnyx is unremarkable

A/P: probable chronic obstructive pulmonary disease rather than asthma, supported Claimant on her quitting smoking; given samples of Atrovent inhaler and will follow up if she is not improve back to her baseline; Depression-continue Paxil

2/17/04:
CC: Bronchitis and coughing up green phlegm; some pain in upper back for past 2 days, able to quit smoking for about 1 week, has had a lot of congestion and some low back pain too
HPI: Pharnyx is mildly erythematous; has severe cough in the office, nares are swollen with some purulent material noted; some mild paraspinal lumbar tenderness; coarse breath sounds, but lungs are otherwise clear
A/P: Has upper respiratory infection plus the sinusitis; given Omnicef and Rhinocort Aqua samples; for low back, may try some Celebrex prn.

3/3/04:
CC: follow-up visit for severe bronchitis with wheezing.
HPI: Claimant feeling much better, started on multivitamins, also on Paxil CR, Atrovent inhaler, lungs clear, Heart normal S1 and S2, no murmurs, rubs or gallops
A/P: Has probable early emphysema, asked to work on quitting smoking, given the 1-800-QUIT line

5/12/04:
CC: here b/c was scratched by a dead cat when she picked it up; she was worry it can get infected, happened 4 days ago; wants something less addictive for her insomnia, needs refill (illegible), isn't having any breathing problems
HPI: well developed, well nourished, NAD
A/P: CTA wheezes (illegible), Abdomen RRR, Psych-good eye contact, adequate affect; insomnia, asthma, (illegible) RTC as needed, she will F/U with Darlene & Dr. Gullapalli in 2 weeks (illegible)

7/21/04:
CC: Irregular bleeding
HPI: Has history of depression and remote history of alcohol abuse
A/P: Slightly prolonged menses, referred for annual gynecological check-up; may need D & C

8/13/04:
CC: has COPD, depression, here for "sores in throat and tongue for 2 weeks." She has gotten to the point where she dreads eating because it hurt so much.
HPI: Does not see any visible ulceration or thrush in the mouth, but Claimant has generalized sensitivity in the mouth. No lymph node adenopathy
A/P: Prescribed some Magic mouthwash with nystatin, Xylocaine, and Mylanta. She will swish and follow that 4 times a day. Follow-up if not improved

12/2/04:
CC: Here for follow-up for COPD.

HPI: Needs refills for Atrovent and amitriptyline; doesn't feel Paxil is working because she is in tears all the time over situation with her daughter; patient is still smoking but has been able to stay sober off alcohol; lungs clear; heart regular

A/P: Discussed importance of her quitting smoking; was given flu shot; was strongly encouraged to continue follow-up with counselor and psychiatrist and here if needed

2/1/05:
CC: Return visit for COPD and depression She is doing much better in regard to some family situations and she feels fairly hopeful.

HPI: She is on Paxil, Atrovent, and amitriptyline in PM; Has cut way back on smoking to half pack/day; gained 11 pounds since then; Lungs have decreased breath sounds throughout, Heart is regular

A/P: Depression-continue current medications, she does follow occasionally with counselor; COPD-get formal pulmonary function test and consider Spiriva but her symptoms are reasonably controlled now. Continue working on quitting smoking.

4/26/05:
CC: Has COPD, is still smoking but here for pain with coughing for past several days in the right rib area and her back. No definite fever, but has productive cough

HPI: Is out of Atrovent and needs refill of her Paxil CR, Decreased breath sounds, but lungs are clear, No significant wheezing, No heart murmers, rubs, or gallops

A/P: Was prescribed doxycycline and Atrovent is refilled. Consider Advair or Spiriva on next visit. Recent mammogram and PFTs suggest severe chronic obstructive pulmonary disease with bronchodilator response. Follow up in 1-2 months

5/17/05:
CC: known COPD with cough productive of green phlegm for over 2 weeks

HPI: some chest discomfort when she coughs, but she continues to smoke

A/P: Medications Claimant takes: Atrovent, Amitriptyline, Paxil, appears much older than stated age, in no acute distress, pharnynx unremarkable, lungs have trace wheezes bilaterally, overall decreased breath sounds, Asked Claimant to get a chest x-ray, prescribed Bactrim DS with prednisone taper, she will remain on current inhaler, may need to start her on Advair

7/19/05
Patient did not keep appointment

10/20/05:
CC: Follow-up for COPD

HPI: Continues to smoke, takes inhaler, has anxiety, No acute distress, Lungs have decreased breath sounds, but otherwise clear, heart is regular

A/P: has severe chronic obstructive pulmonary disease, she continues to smoke, given refills of Atrovent and will return for flu shot, recent diarrhea is probably viral syndrome, will follow-up if not improved

1/27/06:
Chief Cmplt: Shortness of breath, chest congestion, and cough for the last 4 days
HPI: Female appears older than stated age in no acute distress
A/P: Has Chronic obstructive pulmonary disease exacerbation; proscribed doxycycline 100 mg
b.i.d. and prednisone taper. Reviewed importance of quitting, and patient says she will work on
doing so


7/25/06:
CC: here for regular checkup; sob inhalers not working as well as did in past; needs refills on
meds; had trimalleolar fracture 5/2006 ORIF by Dr. Foster
HPI: Chronic conditions-GERD, Depression, Asthma NOS, Smoker, COPD Exacerbation; No
actue distress, thin, older than stated, Respiratory ascultation can be described as reduced breath
sounds, no cough, respiratory effort is normal, Cardiovascular has regular rhythm, no murmurs,
gallops or rubs
A/P: COPD (496), Try Spriva first thing in AM and use Atrovent PM, She and husband must
quit smoking!; Smoking cessation education brochure


1/11/07
CC: here for follow up city for lumbar strain and sciatic left leg; hx broken foot last spring, has
hardware left ankle; needs to discuss meds and needs some refills, quit smoking, has pain in
lower back at #10
HPI: GERD, Depression, Asthma NOS, Smoker, COPD, "nerves are shot from quitting
smoking"
A/P: no acute distress, thin, older than stated, teeth/gums characterized by edentulous,
respiratory-normal to inspection, lungs clear to auscultation, cardiovascular-regular rhythm, no
murmurs, gallops or rubs, paravertebral muscle spasm, bilateral lumbosacral tenderness, negative
straight leg raising; Sciatica, add naproxen, COPD, try Chantix, depression-increase Paxil


2/21/07
CC: here for pain in back at #10, check left foot, the screw is a problem and Dr. Foster thinks he
may have to do surgery to correct, discuss chantix-had horrible dreams
HPI: Smoker, asthma NOS, GERD, Depression, COPD, patient is former tobacco user
A/P: Sciatica, carpal tunnel syndrome


5/9/07
CC: here for pain in belly, diarrhea and SOB, things she ate "bad steak and cheese sub.", needs
refill on smoking pill and amitriptyline, went back on Chantix, has decreased significantly
HPI: Smoker, asthma NOS, GERD, depression, COPD, no fever, fatigue or night sweats,
negative for cough, no chest pain or palpitations
A/P: no acute distress, nourishment type is well nourished, overall appearance is older than
stated, respiratory-normal to inspection, lungs clear to auscultation, cardiovascular=regular
rhythm, no murmurs, gallops, or rubs; abdominal pain-stool culture, lactose free diet, kaopectate,
diarrhea, COPD

6/28/07

CC: to discuss "falling off the wagon" after 16 years of sobriety; wants to try something else other than Paxil which she has been on for over 10 years; her nerves are extremely bad; also has back pain at #6; hasn't been smoking; gets so tired feels "lord should take her" but wouldn't hurt self

HPI: smoker, asthma NOS, GERD, depression, COPD, constitutional-no fever, fatigue, or night sweats, positive for paresthesia, affects bilateral hands and status is worsening, EMG of right arm was negative in Feb.

A/P: level of distress is tearful, well nourished, overall appearance is older than stated, head/face-normocephalic; respiratory-auscultation described as decreased breath sounds, no cough, respiratory effort is normal; depression-worse, change to Cymbalta, try to get patient back in with LCSW she worked with before, paresthesia-neuro referral, COPD, alcohol dependence-get back in AA immediately over next 2 days


1/9/08:

CC: routine follow up of COPD; has had congestion x one month; color greenish yellow phelgm; needs some refills; sciatic nerve giving pain on left side; anti-depressant pills are not working; she states

HPI: smoker, asthma NOS, GERD, Depression, COPD, dislocation shoulder/ribs 3 fractures; polymenorrhea, dysmenorrhea, endometrial polpy, hysteroscopy, D & C on 1/31/08; Patient is former tobacco user, has tried to stop smoking; no history of alcohol abuse;

A/P: Constitutional-felt feverish and took Tylenol; no acute distress, nourishment type os overweight, overall appearance is older than stated; inspection has detected increased AP diametere, auscultation-mild wheezing, no cough, respiratory effort-normal, cardiovascular-regular rhythm-no murmurs, gallops, or rubs; COPD exacerbation-Doxycycline; Depression-worse, increase cymbalta to 60 mg/day; refer to Dr. Wagner


6/18/08

CC: here for cough x 1 week with green phlegm; brings list in for 4.00 program at walmart; some fever a couple of days ago; no vomiting; some pain in back when coughs. SOB.

HPI: smoker, Asthma NOS, GERD, depression, COPD; patient is tobacco user, no changes to past medical history, no history of alcohol abuse; patient uses caffeine

A/P: Constitutional negative for fatigue, fever and night sweats, gastrointestinal-negative for abdominal pain, constipation, diarrhea and vomiting, no acute distress, well nourished, overall appearance is chronically ill-appearing; no nasal deformity, mucous membranes normal; tongue and throat appear normal; no mucosal lesions; auscultation-decreased breath sounds, no cough, respiratory effort-normal, cardiovascular-regular rhythm, no murmurs, gallops, rubs; Doxcycline, discussed smoking cessation, patient feels she needs a "nerve pill" in addition to Cymbalta so Buspirone tried; 2-3 month follow-up


7/25/08

CC: Asthma, routine visit, needs refills on medications, still smoking, uses nebulizer, COPD, GERD

HPI: Smoker, Asthma NOS, GERD, Depression, COPD, Mother is deceased, father is deceased,

Patient is tobacco user, has tried to stop smoking, no history of alcohol use, patient uses caffeine, A/P: no acute distress, well nourished, overall appearance is older than stated, Head/face: normocephalic, eyes: no exophthalmus, pupillary reaction is normal and extra occular movement intact; chest-symmetric, auscultation-decreased breath sounds, no cough, respiratory effort is normal, cardiovascular-regular rhythm, no murmurs, gallops, or rubs; COPD-severe; Depression (311). Pulse Ox Single-completed

10/23/08
CC: Asthma, GERD, depression (stable), COPD (still smoking 4-8 cigs/day); feels short of breath most days, uses nebulizer at home
HPI: smoker, asthma NOS, gerd, depression, COPD, patient is tobacco user, has tried to stop smoking; no history of alcohol abuse; patient uses caffeine (coffee and tea);
A/P: negative for fatigue, fever, night sweats, COPD (496), Depression (311); cymbalta 60 mg, singulair 10mg, spiriva 18mcg, amitriptyline Hcl 50 mg, Atrovent 18 mcg, Naproxen 500 mg, Ipratropium Bromide .2 mg/ml, Buspirone Hcl 10 mg

12/18/08
Following administration of bronchodilators, there is an excellent response,
Conclusion: Severe obstructive airways disease

**Washington County Hospital Association, 10/6/2000 (Tr. 193-201)**
10/6/00:
CC: Chest pain
HPI: Claimant states she was in her usual state of health until she was at work today lifting when she began experiencing sharp substernal chest pain; pain worsened with any movement or moving her arm; she then went to employee lounge and symptoms continued; associated with some dyspnea, palpitations, and shortness of breath, and patient was brought to ER; Patient reports her symptoms have nearly resolved at this point; she admits she was been under a lot of stress for last few weeks and has been working overtime; does a lot of manual labor at work; denies any specific injury to chest or arms; patient hasn't had any chest pain previous to this
*Physical Examination:
        -Vital Signs: stable, she is afebrile
        -General: patient is well-developed, well-nourished woman in no acute distress
        -Head: atraumatic and normocephalic
        -Eyes: Extrocular muscles are intact; pupils equally round & reactive; conjuctivae clear
        -ENT: hearing intact; nose is w/o discharge; oral cavity and or pharynx w/o lesions;
                mucus membranes are moist
        -Neck: supple w/o masses or thyromegaly, no JVD
        -Cardiovascular: heart has regular rhythm and rate; no murmurs, rubs or gallops; +2
                pedal pulses bilaterally w/o edema; 2+ carotid pulses bilaterally w/o bruits
        -Respiratory: Lungs are clear to auscultation w/o wheezes, rales, or rhonchi; breath
                sounds equal w/normal respiratory effort
        -Gastrointestinal: Abdomen soft, nontender, nondistended w/positive bowel sounds and
                no rebound or guarding; no hepatosplenomegaly, masses or hernias

-Skin: no rahses or lesions; no diaphoresis
-Lymphatic: no cervical or supraclavicular nodes
-Musculoskeletal: minimal tenderness along left costosternal border; some tenderness over the left trapezius and pain w/range of motion of left shoulder
-Genitourinary: no bladder or costovertebral angle tenderness
-Neurologic: Cranial nerves II-XII are intact; motor is 5/5 throughout and sensation is intact to light touch throughout; reflexes are symmetrical with downgoing toes
-Psychiatric: patient is alert and oriented times three. Judgment, insight, affect, memory and mood are normal

A/P: Differential includes angina, musculoskeletal pain, costochondritis, pneumothorax, and peridcarditis; patient appears to have musculoskeletal chest pain, likely associated with her increased work load over the last few days. Stress may have exacerbated her symptoms today; given instructions concerning the above; given a prescription for Naprosyn and is to follow up with Dr. Golden as needed or if not improved in the next two days. Also given a note for work to be off work for two days.

**City Hospital, 10/31/2001-5/15/2006 (Tr. 202-234)**
10/31/01 (Radiology Report):
Clinical Indications: Cough-DOS
PA & Lateral Chest: The cardiovascular silhouette is normal in size and configuration; lungs appear clear; no pleural fluid is noted; no bony abnormality is seen
Impression: Normal chest

4/5/02 (Emergency Room Note):
CC: chest pain
HPI: had episode of synecope about 1 month agowhile watering her garden, then 2 weeks ago-had near syncopal episode while mowing the grass; sharp pain in left shoulder that went into her tricept; not associated with nausea, vomiting, diaphoresis or shortness of breath; patient admits to being very distraught but with some social situation that began occurring during the interview A/P: She is quite nervous; is tachycardia; other vitals normal; she is tearful; lungs clear anteriorly and posteriorly; cardiac is without murmur, click or rub; has pain to palpation in left supramammary area around the midclavicular line, third intercostal space; EKG showed normal sinus rhythm; chest x-ray was normal; received IV of Toradol and got some relief; given some Phenergan since she had a little nausea and came up with plan to offer her admission to hte chest pain unit of go home; got upset and pulled out her IV; chest pain is likely musculoskeletal; adult adjustment disorder; follow-up with Dr. Struthers ASAP.

4/5/02 (Diagnostic Radiology Report):
Exam: DX Chest PA & Lat
Clinical History: Chest Pain
Chest: cardiovascular silhouette is normal in size and configuration; lungs appear clear; no pleural fluid is noted; no bony abnormality is seen
Impression: normal chest

4/26/02 (Nuclear Medicine Report):
Exam: NM Myocrd Perf S/R Spect; NM Myocrd Perf w/ EF; NM Myocrd Perf W/Wal Mot
Clinical History: left sided chest pain
Impression: normal myocardial perfusion scan including left ventricular ejection fraction

7/31/02 (Emergency Room Note):
CC: Overdose
HPI: alleging she drank half of a fifth of Jack Daniels, smoked marijuana and took an unknown
amount of Trazadone which was later learned to be 12 in number; patient has been intermittently
suicidal over last week and a half because of a compilation of stressors including: son's death in
1994, friends death five days ago, death of mother or father who died in the last year; patient
thinks that is all that she can take and she is still mourning over the loss of her son in 1994.
Patient was suggesting persistent thoughts of suicidal ideation; past history of depression,
allegedly seen multiple psychiatrists; has not drank since 1993
A/P: Patient was tearful and angry/hostile toward doctor; was oriented to person, place nad time;
was foul mouthed; eventually committed to safety; did not want to be examined by doctor, but
allowed the medical student to do so; received activated charcoal 50 grams; received an IV of
normal saline wide open b/c BP was somewhat low; had urine drug screen that was positive for
marijuana; had alcohol level of 118; Her salicylate, acetaminophen, Barbituates, Benzodiazepine
and tricyclics and beta HCG were negative; commitment to safety form that was signed; referrals
for Dr. Gullapalli, the crisis center and return for recurrence; suicidal ideation currently in
resolution.

4/22/03 (Mammography Report):
Exam: Mammo Diagnostic RT
Rt Dianostic Mammo: CC spot compression magnification view as well as a true lateral view of
hte right breast are obtained
Impression: punctate calcifications in the outer quadrant of the right breast are likely benign.
Followup diagnostic mammo of right breast is recommended within 6 months

9/10/03 (Mammography Report):
Exam: Mammo Diagnostic RT
Clinical History: Calcification in right breast
Impression: No mammographic evidence for malignancy; patient should return to screening and
come back in 6 months for bilateral screening mammo

2/19/04 (Diagnostic Radiology Report):
Exam: DX Chest PA & LAT
History: Productive cough
PA & Lateral Chest: cardiovascular silhouette is normal in size and configuration. Lungs clear;
no pleural fluid is noted; no bony abnormality is seen
Impression: normal chest

3/4/04 (Mammography Report):

Exam: Mammo, Screening
Clinical History: Routine
Impression: Benign finding

11/8/04 (Diagnostic Radiology Report):
Exam: DX Chest PA & LAT
Clinical History: Menorrhagia, endometrial Polyp
PA & LATERAL Chest: Cardiovascular silhouette is normal in size and configuration; lungs appear clear; no pleural fluid is noted; no bony abnormality is seen.
Impression: normal chest

11/11/04 (Operative Note):
Preoperative Diagnosis: Menometrorrhagia; endometrial polyp
Postoperative Diagnosis: menometrorrhagia; endometrial polyp
Operation: Hysteroscopy; dilatation and curettage
Description: The condition of the patient on leaving the operating room was good.

3/7/05 (Mammography Report):
Exam: Mammo, Screening Digital
Impression: No mammographic evidence for malignancy

5/20/05 (Diagnostic Radiology Report):
Exam: DX Chest PA & LAT
Clinical History: Cough
Chest (2 views): Cardiac silhouette is normal, lungs clear, no infiltrates, edema, or pleural effusions
Impression: Unremarkable chest radiographs

1/30/06 (Diagnostic Radiology Report):
History: Cough
PA & Lateral Chest: cardiac size is normal; lungs clear; no infiltrates, edema, or pleural effusions. There is a healing, non-displaced fracture of hte right posterior lateral 7th rib.
Impression: clear lungs

3/22/06 (Memmography Report):
Bilateral Screening Memmogram: Positive family history, no clinical history of palpable lump; Routine CC and MLO views of both breasts were done; no evidence of a spiculated mass or suspicious calcifications

5/15/06 (Emergency Room Note):
CC: left ankle/foot injury
HPI: fell down an embankment on the evening of 5/12/06 while camping in PA. Was seen at local hospital there and diagnozed with a trimalleolar fracture and told to follow-up with her orthopedist. Patient presents here today because of pain and states she's not sure who to follow-

up with. Records from hospital showed she had been consuming alcohol at the time enough that prevented definitive treatment at the time. Patient denied any other injuries

A/P: middle-aged female complaining of left foot and ankle pain; has a positive dorsalis pedis pulse; I can palpate it and it is strong; has no pain with passive range of motion of the toes; no capillary delay;

      -Heart: regular rate and rhythm

      -Lungs: clear

      -Abdomen: obese, soft and non-tender

      -HEENT: Negative for signs of trauma although she has very poor dentition

      -X-ray revealed trimalleolar fracture left ankle

Will maintain and splint and follow up with Dr. Foster; is to use crutches as she needs; will be given a few Lortab for pain; did receive 1 mg of Dilaudid here; had the Ace wrap loosened and reapplied but the split has been left intact; patient's condition on discharge is considered good.

5/15/06 (Diagnostic Radiology Report):

Left Ankle Three Views: There is a transverse fracture through the medial malleolus with 5 mm distraction and slight valgus angulation. There is an oblique fracture through the lateral malleolus, with 1 cm lateral displacement of distal fragment and slight valgus angulation. There is a minimally displaced, predominately vertical fracture through the posterior malleolus. Impression: Tri-malleolar fracture, with slight valgus angulation

**Shenandoah Valley Behavioral Health Svcs, 7/31/2002-3/15/2005 (Tr. 243-266)**

7/31/02:

Presenting problem: S/P suicide attempt, substance abuse relapse (alcohol, marijuana); recent break with daughter

Current Stressors: death of close friend, loss of both parents in past year; care of family with multiple stressors; special trauma; rape; sexual abuse as a child; major losses; physical, sexual, emotional and verbal abuse as a child;

Past Diagnoses:

      -substance abuse; depression

Current Diagnoses:

      -substance abuse; depression

Cognitive Exam Score of 30 out of 30.

Educational, vocational and/or occupational history:

      *Taco Bell-3 years

      *Dunkin Donuts-2 years

      *Goodwill-4 years

      *Housekeeping, Bookkeeping

      *Justin Boot Company-6 years

Substance Abuse Assessment:

      -alcohol: started at 8 years old, sober since 1993

      -Marijuana: started at 11 years old, not used since 1993

      -Crystal Meth: Started and quit in 1988

      -Drug of choice: alcohol

-Prior substance abuse treatment: illegible

Mental Status Examination:

    -Sensorium-alert to hr, mo, day, year; oriented to person, place

    -Appearance: neat, clean, well-groomed, casual

    -Attitude toward examiner: friendly, cooperative

    -Behavior: good eye contact, tearful

    -Affect: flat/blunted, irritable, depressed, panic attacks

    -mood: sad; mood changes from sad to irritable sometimes happy

    -Thought process: coherent

    -Thought content/Perception: somatic preoccupation, thinks she has heart condition not substantiated by medical evidence

    -Symptom Checklist: hopeless, helpless, worthless, weight loss, sleep disturbance, mood wings, guilt, decreased libido, SOB, palpitations, chest pain, hyperventilation

    -Dangerousness: suicidal ideas

    -Integrated Summary: illegible

Diagnosis:

    -Axis I: Depression (illegible)

    -Axis II: illegible

    -Axis III: no physical disorders and conditions noted

    -Axis IV: psychosocial stressors (illegible), severity 2

    -Current GAF score: 58

Spirituality:

    -believes in a God

    -Patient goes to church, would like to learn more about prayer, and pray is her source of hope/meaning/comfort/peace/love/connection

Nutritional Assessment:

    -Typical eating pattern is breakfast, lunch, and dinner for patient

    -30 lbs in recent unexplained weight

Medications:

    -Illegible

    -allergy to codeine

8/19/02:

Individual Treatment Plan:

    Problem: Depressed mood

        -ID stressors and limits in personal lift, develop coping skills to avoid clinically depressive moods, continue current goals

    Problem: Codependency, Maintain SA recovery

        -recognize behaviors of codependency, report any use of alcohol, caffeine, and other drugs, exercise daily and no use of such drugs, decrease caffeine intake

    Problem: Need of support system

        -attend AA/NA meetings; obtain recovering sponsor

Axis I: Depression

Axis II: Deferred until exploration of dependent personality

Axis III: None noted

Axis IV: Relationship losses
Axis V: GAF=58


2/12/03:
Individual Treatment Plan:
      Problem: Depressed mood
          -increase social contacts, develop coping skills
      Problem: Codependency, Maintain SA recovery
          -attend AA/NA meetings, contact sponsor at least 1x every 2 weeks
      Problem: Need of support system
          -contact sponsor outside of meetings
Axis V: GAF is 60


5/12/03:
Individual Treatment Plan:
      Problem: Depressed mood
          -ID stressors and limits in personal life, maintain coping skills to avoid clinically depressive moods, continue current goals
      Problem: Codependency, Maintain SA recovery
          -recognize behaviors of codependency, report any use of alcohol, caffeine, and other drugs
      Problem: Need of support system
          -maintain attendance at AA/NA meetings
Axis V: GAF is 75


8/12/03:
Individual Treatment Plan:
      Problem: Depressed mood
          -ID stressors and limits in personal life, maintain coping skills to avoid clinically depressive moods, continue current goals
      Problem: Codependency, Maintain SA recovery
          -recognize behaviors of codependency, report any use of alcohol, caffeine, and other drugs
      Problem: Need of support system
          -maintain attendance at AA/NA meetings
Axis V: GAF is 80


11/12/03:
Individual Treatment Plan:
      Problem: Depressed mood
          -ID stressors and limits in personal life, maintain coping skills to avoid clinically depressive moods, continue current goals
      Problem: Codependency, Maintain SA recovery
          -recognize behaviors of codependency, report any use of alcohol, caffeine, and

other drugs
   Problem: Need of support system
     -maintain attendance at AA/NA meetings
Axis V: GAF is 80

<u>2/12/04:</u>
Individual Treatment Plan:
   Problem: Depressed mood
     -ID stressors and limits in personal life, maintain coping skills to avoid clinically depressive moods, continue current goals
   Problem: Codependency, Maintain SA recovery
     -recognize behaviors of codependency, report any use of alcohol, caffeine, and other drugs
   Problem: Need of support system
     -maintain attendance at AA/NA meetings
Axis V: GAF is 80

<u>5/10/04:</u>
Individual Treatment Plan:
   Problem: Depressed mood
     -maintain current revol of function; continue follow up with psych.; medication management
Axis V: GAF is 80

<u>8/10/04:</u>
Individual Treatment Plan:
   Problem: Depressed mood
     -Maintain current level of function
Axis V: GAF is 75

<u>3/15/05:</u>
Individual Treatment Plan:
   Problem: Depression in remission
     -medicate to maintain remission
Axis V: GAF is 70

<u>9/26/05:</u>
Original presenting problem: suicide attempt, substance abuse relapse
Services delivered: med management; Pt compliant until 6/2005. No contact/no show
Separation Status: client terminated against advice
Diagnosis at discharge: depression, defferredi

**<u>Dr. Foster, Center for Orthopedic Excellence, 5/17/2006-7/10/2006 (Tr. 235-242)</u>**
<u>5/17/06:</u>

History: fell coming down a bank up in PA, had a fracture, has been 5 days since she fractured it and going to proceed with an open reduction internal fixation

Physical exam: vital signs stable; patient alert and oriented; with attention to her left ankle, she is in a sugar-tong splint; toes are pink; neurovascularly she is intact; no pain with passive motion of toes

Impression: left ankle trimalleolar fracture

Plan: open reduction with internal fixation; all risks and benefits were discussed including: bleeding, infection, re-operation, failure of hte procedure; anesthesia risks from nothing to nausea; vomiting, to death. Will proceed as indicated.


5/19/06:

Preoperative Diagnosis: Tri-malleolar fracture, left ankle

Postoperative Diagnosis: same

Complications: none


5/31/06:

Recheck on left ankle post ORIF; incisions look great; staples were removed; xrays show good alignment of the ankle

Plan: Put patient in Cam boot; she is to remain toe-touch to partial weighbearing at maximum. Will see her in 2-3 weeks, get an x-ray and make further recommendations at that time; given proscription for Lortab


6/14/06:

Recheck on left ankle; status post ORIF; incision looks great, good dorsal and plantar flexion;

Impression: left ankle status post ORIF, doing well

Plan: see patient in 2-3 weeks and make further recommendations at that time


7/10/06:

Recheck on her left ankle; doing well with it; good dorsi and plantar flexion; offered therapy but patient declined; will see her back 1 more time in 6-8 weeks and probably give full release


**Dr. Frank Roman, Psychiatric Review Technique, 01/05/07 (Tr. 269-282)**

1/5/07

Impairment(s) not severe

Categories upon which the medical Disposition is based:

    -Affective disorders

        *Depressive syndrome characterized by at least four of the following: anhedonia or pervasive loss of interest in almost all activities; decreased energy; feelings of guilt or worthlessness

    -Functional Limitation:

        *Mild restriction of Activities of Daily living; Mild difficulties in maintaining social functioning; Mild difficulties in maintaining concentration, persistence, or pace; No episodes of decompensation, each of extended duration

    -Evidence does not establish the presence of "C" criteria which are:

-Background Information:
      \*Case Type: title II...AOD: 11/30/00...DLI/CD: 9/30/05...ALJ: Na...Prior:
      NA..Age 44; work experience: fast food; Ed: 14..SpEd: No; alleges major
      depression; DO/FO Comments: No problems
-Current/Prior Treatment:
      \*Psychiatric Hospitalizations: N/A
      \*Outpatient Treatment: Shenandoah Valley Behavioral Health
-Latest Mental Eval:
      \*Eval Type: Mse...Date:8/02...Src: Above...Dx: Depression/Bipolar
      \*Remarks:...Alleg: Above...Mood: Sad...Affect: Flat/blunted, irritable,
      depressed, panic...Immed: N/A/...Rec: N/A...Rem: N/A...Con:
      N/A...Per: N/A...Pace: N/A...SF: N/A...Other: thought process
      coherent, thought content somatic preoccupation/suicidal
      ideas...Testing: N/A; ADLs: Yes...AFR: N/A...C/E...N/A...3rd:
      N/A...MSS: N/A...
\*Based on MER claimant is credible and capable. Depression appears to be result of
physical limitations


**Dr. Porfirio Pascasio, Physical RFC Assessment, 1/17/2007 (Tr. 283-290)**
-Primary Diagnosis:
      \*Asthma/Emphysema
-Secondary Diagnosis:
      \*Tri-malleolar Gx L Ankle S/P ORIF
-Exertional Limitations:
      \*Occasionally lift and/or carry 20 lbs
      \*Frequently lift and/or carry 10 lbs
      \*Stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8hr day
      \*Sit (with normal breaks) for a total of: about 6 hours in an 8 hour workday
      \*Push and/or pull: unlimited, other than as shown for lift and/or carry
-Postural Limitations:
      \*Can Occasionally Do:
         -Climb ramp/stairs; Balance; Stoop; Kneel; Crouch; Crawl
      \*Can Never Do:
         -Climb ladder/rope/scaffolds
-Manipulative Limitations:
      \*None established
-Visual Limitations:
      \*None established
-Communicative Limitations:
      \*None Established
-Environmental Limitations:
      \*Unlimited:
         -Extreme cold/heat, wetness, humidity, noise, vibration
      \*Avoid concentrated exposure:

-Fumes, odors, dusts, gases, poor ventilation, hazards (machinery, heights, etc).
-Symptoms:
　　*She is not credible. She says she can only lift 2-3 lbs when she can perform a light type of work lifting 10 lbs frequently.
-Additional Comments:
　　*She stated that her husband helps her in and out of the bath tub because of her foot. She prepares meals with her husband. States she does inside chores and husband does outside chores. States she drives and goes shopping. States she has trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs. States she can only lift 2-3 lbs. States she can only walk to the mailbox at the end of the driveway and back. States she uses a cane and brace when walking long distances-prescribed on 6/06.
-Case Analysis:
　　*Insufficient evidence prior to DLI

**Dr. Subhash Gajendragadkar, Physical RFC Assessment, 3/15/2007 (Tr. 297-304)**
-Additional Comments:
　　*Age 42 (at DLI), AOD 11/30/00, DLI-9/30/05
　　*Allegations- asthma, emphysema, spinal problems, COPD, sleeping problems, surgery on left foot
　　*See prior PFRC (Light prior to DLI, however, it should've been insufficient evidence priot to DLI)
　　4/02: myocardial perfusion normal
-Insufficient evidence prior to DLI of 9/30/05–AFFIRMED.

**Dr. Jim Capage, Psychiatric Review Technique, 3/15/2007 (Tr. 305-318)**
-Medical Disposition:
　　*Insufficient evidence
-Consultant Notes:
　　*Age 42 (at DLI), AOD-11/30/00, DLI-9/30/05, ED-14
　　*Allegations: major depression, trouble concentrating
　　*See prior PRTF
　　*8/02: Dx: Depression, Bipolar
-Insufficient evidence prior to DLI of 9/30/05

**Dr. Dimitri Misalidis, MRI Report-City Hospital, 9/12/2007 (Tr. 321-322)**
9/12/07
-Exam: MRI Cervical Spine WO/W Con
-History: Cervical radiculopathy. No known trauma or prior surgery
-MRI of Cervical Spine:
　　There is good alignment to the anterior and posterior column. Cervical medullary junction is normal. No evidence of cystic degeneration or demyelination of the cord. On the post contrast images...there is no evidence of enhancing focus. No evidence of cord mass.
-Impression: No evidence of cord lesion or syrinx; broad based discogenic bar noted at C5-C6

and C6-C7 with associated central canal stenosis, as well as narrowing of the neural foramina bilaterally; facet disease of the upper cervical spine at multiple levels.

**Mr. Harry Hood, Mental Status Examination, 1/20/2009 (Tr. 379-386)**
-General Observations:
    *No observed medical impairments, proof of ID was provided with WV driver's license
-Psychosocial History:
    *Youngest of 6 kids, raised alone due to her parents having previous marriages, reports being sexually abused at age 5 and that both of her parents were alcoholics; mother was physically abusive to her; has been married 4 times, divorced 3, been married to Jeffrey for 20 years; has 1 grown child and another child is deceased
-Chief Complaints:
    *reports she is applying for benefits because "the depression is one thing, breathing is not good, and degenerative disk disease."
    *Onset for depression-1994, disability date-2000, claimant reports having trouble dealing with the public, when she sees a child, she oftentime cries, can become irritable, and has physical limitation; no work return attempts
-Presenting Symptoms:
    *Claimant reports depression where she is depressed most days, has low energy levels, tends to isolate spending multiple days in bed at a time, fair self-image with no current suicidal or homicidal thought, however a history of suicidal ideation and gesture; reports significant sleep disturbances and limitations in energy
-Review of records:
    *impression previous was major depressive disorder, rule out bipolar disorder and post-traumatic stress disorder, ability levels in August 2002 were in borderline range in readings, impaired range in spelling, low average range in math, diagnosis made was major depressive disorder, bereavement, alcohol abuse, and borderline intellectual functioning
-Mental Treatment History:
    *Claimant currently not receiving psychiatric care, last seen in 2004, was in therapy with Darlene, reports having been in therapy almost continually from 1994 after son's death, until 2004, reported suicide attempt in 2002 through overdose
-Medical History:
    *treated for depression, COPD, asthma, degenerative disk disease, currently she smokes 3-4 cigarettes/day
-Substance Abuse History:
    *Reports significant history of alcohol abuse with 4 DUIs; indicates she stopped consuming in 1993 and has experienced 2 relapses since that time with the last occurring in June of 2008; indicates before 1993 she smoked marijuana and used cocaine, but has had no controlled substances since that time
-Vocational Background:
    *claimant last worked at Taco Bell as a crew person for approx. 5 years, worked at Dunkin Donuts for 1 year, Goodwill Industries for 3 years prior to that.
-Mental Status Examination:

    *Appearance: appears older than her stated age
    *Attitude/Behavior: Cooperative
    *Speech: clear
    *Orientation: present x4
    *Mood: Depressed
    *Affect: Restricted
    *Though Process: Stream of thought appeared to be relatively well organized
    *Thought Content: No evidence of delusions, phobias, or obsessions was seen, however, claimant reports significant intrusive dreams related to death situations
    *Perceptual: Illusions and hallucinations were not present
    *Insight: fair; Judgment-average, based on a correct response to the question of the lost letter
    *Suicidal/Homicidal Ideation: Claimant denies current suicidal or homicidal thoughts
    *Memory: immediate-within normal limits; recent-within normal limits, with claimant recalling 3 of 4 words after a delay; remote-within normal limits
    *Concentration: mildly deficient, based upon score of 7 on DS subtest
    *Psychomotor Behavior: within normal limits; *Persistence/pace=w/i normal limits

-Social Functioning:
    *Social skills during today's interview are rated as being mildly impaired related to restricted affect and depression
    *Self-reported: Claimant rates her social skills as being below average, indicating she does not go out and doesn't associate w/people

-Daily Activities:
    *Claimant gets up at 8am, will discuss daily activities w/husband, will have breakfast, take meds and lays down for a few hours, will do light housework, will fix dinner with husband, then watch TV, lays down at 8:00pm and sleep is disturbed

-Activities List:
    *Claimant will do light housework, cooking with husband, will do dishes, laundry, grocery shopping, does not drive at this time due to probable anxiety, has no current hobbies, formerly enjoying doing outside work activities

-Subjective Symptoms:
    *Depressive disorder and physical disorders

-Diagnosis:
    *Axis I: Major Depressive Disorder, Moderate, recurrent
    *Axis II: Borderline Intellectual functioning, per history
    *Axis III: COPD, degenerative disk disease (per claimant)

-Diagnostic rationale:
    *Major depressive disorder diagnosis was made based upon Claimant's hisotry, currently observed depressed mood, reports of experiencing depressed mood most days of week, periods of withdrawal where Claimant will remain in bed for several days at a time, impairments in energy levels, sleep disturbances with no current suicidal ideation, however, a history of suicidal ideation and gesture; borderline intellectual functioning diagnosis was included based upon 2002 review indicating borderline skill level

-Prognosis:

*poor in that the Claimant is not in active treatment
-Capability:
    *Believes Claimant has the capacity to assist in the management of her own financial affairs
    *Ability to understand, remember, and carry out instructions are affected by impairment
        -Mildly affected:
            * understand and remember simple instructions
            *carry out simple instructions
            *ability to make judgments on simple work-related decisions
            *understand and remember complex instructions
        -Moderately affected:
            *ability to make judgments on complex work-related decisions
            *carry out complex instructions
    *Depression, w/ low average to borderline ability would influence these factors
    *Ability to interact appropriate with supervision, co-workers and public is affected by impairments
        -Moderately affected
            *interact appropriately with the public
            *interact appropriately with supervisors
            *Interact appropriately with co-workers
            *Respond appropriately to usual work situations and to changes in a routine work setting
    *Depression would impact Claimant's intrapersonal relations w/co-workers and customers


    *No other capabilities are affected by the impairment
    *Claimant can manage benefits in her own best interest

**Dr. Seth Tuwiner, Disability Determination Examination, 1/31/2009 (Tr. 387-399)**
CC: Neck and low back problems, sleep difficulty, ankle problems, chronic obstructive pulmonary disease and severe depression
HPI: Claimant developed neck problems in 2005, has had MRI and electrodiagnostic evaluation; has only had physical therapy; she experiences a constant aching, stabbing pain in cervical spine with bilateral (right greater than left) radiation down the arms in a nonspecific pattern; she also may have numbness and tingling in the fingers in a nonspecific distribution; she also notes having cramping; her symptoms are worse with abduction and forward flexion of the arms; claimant has had low back pain since 1980s; has underlying spina bifida; has only ad x-rays without any other adjunct testing or treatment for her low back pain; has a frequent aching pain with shooting pains bilaterally; her symptoms are worse with bending, stooping, crouching, and lifting; has had foot pain for more than 2 years, did require previous surgery requiring open reduction/internal fixation with hardware placement; hardware has been removed; experiences intermittent aching and swelling in her left foot especially on weightbearing and ambulation status; has at least 30-year history of smoking more than 1 pack/day; frequent wheezing and dyspnea, has not had a formal pulmonary function test; had a diagnosis of chronic obstructive

pulmonary disease; never admitted for breathing crisis; has severe depression since 1994 when her son passed away, did have prior suicidal attempt, was put on medication, does have depressive features, though no longer has suicidal ideation

-Medications:

    *Elavil, Naprosyn, Singuilair, Cymbalta, Buspirone, inhaler ipratropium bromide

-Social History:

    *married with 2 children, 1 deceased child, currently smokes 1-1/2 pack/day, had a history of heavier smoking, denies current recreational drug use or alcohol consumption, though does admit to prior drinking and marijuana abuse, had high school degree and worked at Taco Bell until 2000.

-Impacting Activities of Daily Living:

    *Independent with activities of daily living, is not driving, can walk less than a block, has difficulty with reaching at time due to neck pain

-Physical Examination:

    -HEENT:

        *Disks are sharp on funduscopic examination, cranial nerve examination is normal, no carotid bruits, no thyromegaly

    -Lungs: decreased breath sounds bilaterally w/o any wheezing

    -Heart: reveals a regular rate and rhythm with positive S1 S2 heart sounds, no murmurs, rubs or gallops

    -Coordination, Station, and Gait: has an antalgic gait, is unable to toe, heel walk, or tandem due to pain, Romberg test negative, finger-to-nose testing normal

    -Range of Motion: cervical dorsolumbar, bilateral hip, knee, ankle, shoulder, elbow, wrist, fingers and thumb range of motion is normal

    -Motor Examination: normal tone and bulk throughout. 5/5 power in both proximal and distal joints bilaterally

    -Reflexes: 3+ reflexes bilateral biceps, brachialis, triceps, patella, 2+ reflexes: bilateral ankles, there is spread elicited from bilateral shoulders, plantar responses are flexor

-Diagnosis:

    *Cervical and lumbosacral radiculopathies, these are probable dianoses based on her symptoms, she will require a comprehensive evaluation including MRI and electrodiagnostic evaluation;

    *COPD, claimant has decreased breathing sounds bilaterally without wheezing, this is indicative of her diagnosis of COPD, will benefit from pulmonary function tests and pulmonary consultation

    *Depression: Claimant's depression is severe, would benefit psychiatric follow up

    *Sleep impairment: most likely related to her depression

    *Left foot posttraumatic arthritis

-Functional Assessment/Medical Source Statement:

    *The number of hours the Claimant would be expected to stand and walk in an 8 hr day is approximately four hours. She had no limitation with sitting, and does not require an assistive device.

    *She has frequent postural limitation of bending, stooping, crouching. These respective activities may exacerbate her underlying lumbosacral radiculopathy.

*She has occasional manipulative limitation with reaching. She does have normal range of motion, however, frequent abduction and foward flexion may exacerbate her arm problems, the amount of which she can lift both frequently and occasionally; approximately 10 lbs occasionally, 5 lbs frequently.
*No other relevant limitations at this point and time.
*None of the impairments affect the Claimant's hearing or vision

D.    Testimonial Evidence

Testimony was taken at the hearing held on December 12, 2008.  The following portions

of the testimony are relevant to the disposition of the case:

(The claimant, DOROTHY J. MARTELL, having been first duly sworn, testifies as follows:)

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:
Q    Ms. Bolt (sic), what is your address?
A    It's 381 Charity Circle, Falling Waters, WV
                    *                    *                    *
Q    ...In your own words, let's start there, can you tell me why you're unable to work?
A    It's hard to deal with people anymore. It's very hard, I don't know how to say it, though I've had–
Q    Let's go, would it help if we start earlier? And I notice that you've had a lot of difficult in 2001 and 2002 with grief.
A    Yes, ma'am
Q    Is that what, is that, and that, did you have a suicide attempt in 2002?
A    Yes, Ma'am, I did.
Q    And how, are you still receiving mental health treatment now?
A    Yes, Ma'am, from my doctor
Q    From your regular doctor, not from a psychologist or a psychiatrist?
A    No, ma'am. They felt that I had went as far as I could with Dr. Galopalo, and since I've been seeing Dr. Struthers, she believes it's better if I see a grief counselor from hospice.
Q    Okay. ...So is the major problem that you're having now depression or is it the asthma or, I guess, the COPD?
A    It's both, ma'am.
Q    Okay. Can you tell me about each one and whichever one you'd like to talk about first?
A    Well, it started in 1994 when I lost my son. I went through a lot of grief. And then in 2000, I worked up until 2000 and that's when I found out my mother had lung cancer and my father's health was really bad. And in 2001, my father passed away in August and then my mother passed away in December.
Q    Oh, my.

A      And the year 2000, I had 11 members die, you know, in our family, and that's just in 2002, I, I fell apart. I tried to keep it together as much as I could, but I fell apart.

Q      How many children do you have?

A      I did have two, I one now, a daughter.

Q      And how old is she?

A      She's 24.

Q      Is she living with you?

A      No, ma'am. She has her own family.

Q      And, whose–are you living alone?

A      No, I live with my husband.

          *            *            *

Q      How are you dealing with it now? Is it still, is it still just as much a pain issue as it was at the time or has it gotten better?

A      It's actually gotten harder because last year, my husband had two heart attacks and I thought he was going to die. And his brother, the day of his heart surgery, his brother died.

Q      Oh, God.

A      yeah, and actually since then, it's really gotten harder, but I take each day one at a time and do a lot of praying.

Q      And you're not seeing a psychologist or a psychiatrist now? It seems like a very serious —

A      –I'm waiting for Mr. Woods, he's through hospice, I'm waiting for him to call me back and get started through the hospice program with a grief counselor. She feels that would be better because I went through so many years of counseling....and she thinks maybe the grief counselor would be better suited for me.

Q      Now, tell me about the COPD.

A      Well, I used to be a heavy smoker, and over the years, it's just gotten worse. So instead of turning to alcohol, it seemed like my smoking had picked up more and now I'm down to like two or three cigarettes a day and I'm trying so hard to get off of them. And it's I, I'm on a breathing machine, I take three treatments a day and, you know, I try and stay away from animals, dust, you know, things that make it occur, but it's like when I get nervous or excited, then it triggers my breathing.

Q      Are you using a nebulizer at home – or are you going to the hospital?

A      Yes, it's a breathing machine.

Q      Right, but you know what hte drug is, is it albuterol or –

A      Yes.

Q      –Proventil?

A      It's albuterol

Q      Okay. And give me an idea of what a day is like for you. Is your husband home all day also?

A      Yes, ma'am. He is.

Q      So, you do have some help, you're not alone?

A      No. I –

Q      Can you take me through a typical day?

A      I get up and thank the Lord that I'm up that morning. And just me and my husband try to help each other get through the day. And my aunt and my uncle, if it wasn't for them helping me and my husband right now, I don't know what we'd do, but you know, I get up and try to do things around the house. My daughter comes down like every other day and brings my grandson and that helps, you know, being with him. And, of course I don't babysit him because, you know, what goes on and I'm scared to be by myself with him but, you know, thanks to her and her, you know, son and her husband, you know, they get me through the day.

Q      And, basically, are you, how is the COPD? Last thing I read in the record, they said that it was still pretty serious but thought that it would improve if you stopped smoking.

A      Yes, Ma'am.

Q      Is that what, you've cut down on the smoking, are you able, in addition to the nebulizer treatment, are you able to get through the day?

A      Yes, Ma'am...I take Spiriva in the morning and I take a Singulair pill at night and that really helps. Like I said, I used to smoke two packs a day and I've cut myself down to a couple a day and, you know, I just, I keep trying, I really do, I keep trying.

Q      Okay. I'm going to ask a couple of things. Going back now to 2000, I did see a couple of entries but there are very few. At one point, you went to the hospital, I guess your first visit was August 18th, 2000, they said that was the first visit since 1997. And then I saw another note from September 8th, 2000 that says you were under stress because you thought your daughter was in trouble. But that's, so far, that's all I have for the year 2000. And for 2001, I don't have, I don't have anything about the COPD. I do have some information about the psychological, the grieving and the, a need for grief counseling. So I guess what I'm saying is the evidence that I have is fairly sketchy up for that early period.

Atty    Right, Your Honor.

ALJ    And –uh-huh.

Atty    I think I agree with you and we were thinking about amending the onset date to her suicide attempt in 2002.

ALJ    Okay. Oh, okay. Before we do that, would you take a look at the list of exhibits that's there?....

          *          *          *          *          *

ALJ    Are there any exhibits that you object to or that should not be there?

Atty    No, Your Honor.

(Exhibits, previously identified, were received into evidence and made a part of the record thereof).

ALJ    (Inaudible) that you were going to amend the onset date.

| | |
|---|---|
| Atty | Her, her suicide attempt was July 30th 2002. |

    \*        \*        \*        \*        \*

| | |
|---|---|
| ALJ | I wanted to see if there's any new information that was not available then. |
| Atty | I, I'm pretty sure the new information would e in the Shenandoah reports that I submitted, the 53 pages. |

    \*        \*        \*        \*        \*

| | |
|---|---|
| ALJ | Okay. Yeah, and I have that from 2002 from this beginning in, well, after the February, beginning in April when you went toeh emergency room with chest pain. Then on the 29th of April, a shoulder pain that resolved. And then in September, you were depressed, severely depressed again. So I have looked at that and I'm not sure that I'm able to reach any conclusions about it, but, yea, I have looked through the Shenandoah. What date would you amend, did you want to amend the onset to? |
| Atty | I would say the suicide attempt of July 30th 2002. |
| ALJ | Okay. |
| Atty | And, Your Honor, essentially, you know, we have the date last insured issue of September 30th 2005. |
| ALJ | Um-hum. |
| Atty | You know, technically if Your Honor was, after reviewing the evidence, if, you know, you were more comfortable with a date later than the July 2002 date then, you know, certainly we would be, we would be understanding and probably amenable to that as well. |
| ALJ | Okay. I don't have much information before that. I have for 2003, did have several entries about the COPD, with the same thing, saying that it would be better if she stopped smoking. |
| Atty | Right. |
| ALJ | other than that, you know, there's not much that can be done about it, but they still say it's the smoking that's causing the severity of the COPD. |
| Atty | Right. |
| ALJ | And then in 2004, probably about hte same. Yeah, and in 2005, that's the first time I got a little bit more information. In April of 2005, it said the COPD was serious, but it responded very well to bronchodilators. Is that true? |
| Atty | I thought, I may have read it differently. I thought it said, let me find that, that note, I thought it said that the pulmonary function test suggest severe chronic obstructive pulmonary disease that did not respond to bronchodilators. |
| ALJ | Let's find out if I misread it, if I can find that page.... |
| Atty | Yes. It's in the Shenandoah records and since I don't, I don't have it on the CD, but it's about halfway through. |
| ALJ | Yeah, its on page 29. |
| Atty | Okay...It says, suggests severe chronic obstructive pulmonary disease with bronchodilator response, so I guess that– |
| ALJ | All right. |

| | |
|---|---|
| Atty | Yeah, that does mean she did respond somewhat, and actually, the, the report that I faxed to you this morning was, was the pulmonary function test that she was referring to. |
| ALJ | Oh, in 2005? |
| Atty | Yes. |
| ALJ | Okay. Let me take a look at those. Okay. I'll, it looks like they did. It was significant improvement after bronchodilator. |
| Atty | Right, there was improvement. |
| ALJ | Okay. Okay. And then you can walk me through what happened after that from a disability point of view, if some, if the condition is responsive to medication or medical treatment, then it's, even though it's a severe disease, it's not considered as severe, certainly not disabling. But what happened after that? Because I'm concerned that she still has serious COPD and that – |
| Atty | Right. |
| ALJ | Could you tell me? |
| Atty | I sure can. And, again, I think my theory is more a combination of impairments, as well, because the depression, it seems like since the loss of so many family members, that, that's, that kind of threw her into a tailspin and she, during this period of time, every time she would go to see Dr. Struthers like December 2004, she's crying all the time. Paxil isn't working. You know, that's pretty consistent and that, that continues through, through to present, I would argue, You Honor. As far as the COPD, July 25th 2006, there's a note in Dr. Struthers' records that her inhalers weren't working and at that point in time, she had had a COPD exacerbation. Then January 11th 2007, she had broken her foot and having— |
| ALJ | Let me find the July 2006. I'm not sure that I got–oh, July 25th 2006? |
| Atty | Right. |
| ALJ | Not working as well as did in the past. Needs refill. Had a fracture, a foot fracture. So they were going to start at just the medication and, again, she must quit smoking. |
| Atty | Right. |
| ALJ | What happened after that? Okday. Let me let you present it in the way that you were planning to present it. |
| Atty | Okay, sure. |

(Examination of Claimant by Attorney)

| | |
|---|---|
| Q | Okay. Ms. Martell, what was going on with you, first, let's, let's concentrate on the period of 2000 –after your suicide attempt in 2002. From a depression standpoint, what, what sort of symptoms were you having? How was the depression affecting you? |
| A | I wanted to sleep a lot. I didn't want to get myself involved with family because everyone kept just passing away and it seemed like every time I talked to someone in our family, someone else was passing away. And I was scared to even go out of the house because I felt that I was, you know, going to lose someone |

else. And I just basically kept to myself and stayed indoors and felt that if, you know, I stayed away from people, stuff wouldn't happen. And, of course, Dr. Struthers had me, you know, talk to counselors and everything and they were helping me get through it and it just, I didn't, I got scared to go out. I stayed in all the time.

Q      Okay. And when you –

ALJ    When did you stop seeing the counselor? Or give me the dates that you did see the counselor.

Clmt   I believe the last time, ma'am, was in 2004 or 2005. I couldn't afford the, the payments anymore for hte counselors and they also felt that they had taken me as far as they could.

ALJ    Okday. And were they, were these counselors, psychologists or psychiatrists or social workers or what, do you remember?

Clmt   one was a psychiatrist, Dr. Galopalo, and she would see me, it was on an every two weeks and then finally we got to where we went once a month, but also once a month, I would see a counselor that worked there at Shenandoah Behavioral Health. And anytime I felt stressed or needed her, I could call Darlene and, you know, she would talk with me or if she had time for me to come in, she would, you know, help me get through it.

ALJ    And do we have a medical source statement from her? I couldn't find one.

Atty   The only thing we have from her is –I'm sorry, let me find it. The Shenandoah Behavioral Health records have her signature on some of the notes. But, unfortunately, they, because of HIPPA, they only release the individual treatment plans.

ALJ    Um-hum.

Atty   So we didn't have, we don't have her daily or her, you know, contact notes of every time she saw her. But on the, the individual treatment plan, and again, I don't think the exhibit's numbered, but the clinician's signature, Darlene Yost, and she does indicate she's a social worker, February 12th 2004. And there's a May 10th 2004 treatment plan. And then August 10th 2004. And then the last one is March 15th 2005.

ALJ    Okay. Is there any, there's no way she has done a medical source statement?

Atty   No.

ALJ    And since 2004/2005, you've just been getting meds from your regular doctor, not having any mental health treatment?

Clmt   Yes, Ma'am

ALJ    Okay. Continue.

Atty   Oh, Okay.

By Attorney:

Q      And, Ms. Martell, why again have you not received regular mental health treatment?

A      Because we couldn't afford it.

Q      Did you, did you have a certain type of insurance at that point that didn't cover

31

mental health care?

A      Yes, Ma'am. My husband, he had insurance through his work and there were certain parts we had and, you know, certain parts that I had to pay like the first $2400, you know, that was our deductibles and we didn't have that kind of money because he was the only one working.

Q      Okay. Now, you said before September 2005, you slept a lot.

A      Yes.

Q      Was that sort of an escape technique with your depression?

A      Yes, Ma'am.

Q      In the course of a month, how many days do you think you would have spent sleeping, spending hte majority of your day in bed or withdrawn?

A      I'm going to say at least six or seven days a month.

ALJ    Six or seven days a month that you were?

A      Yes, ma'am.

By Attorney

Q      Now, during this period before September 2005, had you, were you, did you have any interests or hobbies or anything like that?

A      No, ma'am.

Q      Okay. How was your energy level?

A      Not very good. I mean, I'd get up and try and do dishes and, you know, I'd do the dishes and I'd go and lay down for a while and then I would get up and I have a lot of books that I had read on death and dying and it seemed like that helped me understand and with the good Lord, I mean, I fee he's the one that's getting me by each day. I did pray a lot.

Q      Okay. And how was your, how was your ability to concentrate before September 2005?

A      It was hard because I always thought about the deaths and, you know, the reoccurrence of just everything going on.

Q      And how are you, on these days where you had, you know, you spent the majority of your time withdrawn or in bed, would you tend to activities of daily living even?

A      Yeah, My aunt, thank God for her, she would come down and help me do things and she'd sit and, you know, make sure I didn't try to harm myself or anything and she would talk with me and help me through. And, you know, I, I cleaned myself everyday, you know, take my bath, you know.

Q      And what about social activities before September 2005, did you, did you engage in any social activities or–

A      No, Ma'am.

Q      Okay. Now, your doctor indicated that you also had problems with anxiety, is that true?

A      Yes, Ma'am.

Q      How long has that been going on?

A      I'm going to say since my parents passed away.

Q       And that was when?

A       2001.

ALJ     I'm sorry, I didn't hear that.

Clmt    2001.

Atty    What sort of, how has the anxiety affected you? What kind of symptoms have you experienced as a result of hte anxiety?

A       I'd like to get excited and stuff and start shaking and get nervous and, you know, I'd like to go to look out the windows to look at the yard and things and, and I'd get scared that, you know, somebody was going to come and give me bad news or just I always thought the worst. I couldn't seem to get past the, you know, trying to pick up the pieces and stuff. I just, I got scared a lot.

Q       Okay. And has, have you had issues with anxiety through to, to present?

A       Yes, ma'am. A lot back in 2007, especially with my husband, you know, I get scared a lot because of him having two heart attacks. In March of '07, he had a quadruple bypass and we almost lost him and then in August, he had another one and, you know it just, I fear, you know, I just – excuse me.

Q       That's okay. Now, you have a history of alcohol abuse.

A       Oh, one day at a time. AA. A sponsor, my neighbor across the road is a big help because I go and talk with her a lot when I have problems and she helps me.

ALJ     Are you still going to AA?

Clmt    No, ma'am, I'm not. I've been sober for quite some time. I –

(By Attorney)

Atty    Just do your best.

A       I, 2007, I had to tell my husband that his brother had died and I fell off the wagon and when I sobered up, I picked myself up and was determined not to do it again and I haven't since then. But, again, I read a lot and just pray to God a lot.

Q       Okay.

A       I'm sorry.

Q       That's okay. Is there anything else that you'd like the judge to know about taht we haven't covered about your conditions and –

A       well, I'm really trying hard to get off the cigarettes. Like I said, I used to smoke two packs a day and I'm down to a couple a day. And with God willing, I'm going to get off of them because I don't want to die like my mother did. She had lung cancer and it was painful.

Q       Okay.

A       And I'm determined, with the good Lord, I'm going to get off of them. And I'll take each day one day at a time.

Atty    Your Honor, just going forward, I know this is a disability application only, but –

ALJ     Oh, is it? I have that it's concurrent

Atty    Oh, do you have that it's concurrent?

ALJ     Yes. Let me make sure. Yeah, according to my information, it's concurrent. Yeah, both applications filed on the same day probably one application for both. But it, did you intend for it not to be concurrent?

33

Atty:   No. I would love for it to be concurrent. It's just on my CD, –I, I couldn't tell because I didn't see, let's see here, I'm pretty sure I only saw Title II application. But if your, if your record is showing Title XVI also, then –

ALJ    I'll go back and check the DDS records, but what I've been given shows that it's both.

Atty    All right. Then I will explore some of the physical issues going on now as well.

ALJ    Okay. And when you're, about the mental, because it is concurrent, I was going to suggest she might need a mental CE.

Atty    Yes.

ALJ    The evidence stops when she stops seeing a counselor.

Atty    Right.

ALJ    And it's not, I don't really have enough. But a mental CE now might, at least for the Title XVI report.

Atty    Oh, definitely. Well, that, and that makes all the difference, you know, if she, she felt that she did file it the same time, but then was initially denied SSI and then she doesn't recall, she doesn't believe she appealed that, but maybe the, Social –

ALJ    No, she didn't. She applied for SSI in 2002.

Atty    Right.

ALJ    And that was denied and she didn't, she didn't appeal it, but let me take another look at the data for the current application. In this one, it just says did. Let's see. Okay. I would have to go back and check because I have opposite data.

Atty    Okay. But I, I agree with You Honor that –as far as the CE goes.

ALJ    (inaudible) for current, but it doesn't include Title XVI, but in another place it does not, so, but I'm going to assume that it's both.

Atty    Okay, great.

(By Attorney)

Q    Ms. Martell, you've developed some problems over the years with your cervical spine, is that right?

A    Yes, ma'am.

Q    Can you describe those problems?

A    I have a, well, I was really in pain one night and my husband took me to the emergency room and they told me I had a, had a lumbar sprain and then I had a sciatica and –

ALJ    When was this?

Atty    This was January 2007.

ALJ    Okay.

Clmt    And Dr. Struthers sent me to a specialist and he found out that I have, I don't know the big term for it.

Q    Right.

A    It's like a –

Q    You had an MRI, right?

A    Yes, ma'am.

Q    And it showed that you had a broad based disc herniation at different levels of

34

your cervical spine, right?

A      Yes, ma'am.

Q      And that you had some stenosis at multiple levels. What, what sort of treatment has been recommended?

A      Eventually, he said I would have to have surgery, but he gave me papers for like exercises and I had done those because, again, I didn't have no insurance and that would cover that part of, you know, so he did give me the papers and I did exercises at home, but –

Q      Do you have pain anywhere now in your body?

A      If I sit for a long period, the back of my neck where, up here where the degenerative disease is, it hurts, you know, and then my sciatica, when it acts up, I have to lay in bed with my feet up and I mean, when it starts, it hurts, but –

Q      Okay. How long –

ALJ    How often does the fact, how often for both, the neck pain and the sciatica?

Clmt   Oh, well, they vary, Your Honor. I mean, there will be times the neck hurts and the bottom of my back doesn't, but then there's times the bottom of the back hurts and the top doesn't. It just depends on what I do and, you know, like if I do the exercises that the doctor had told me to do, it will hurt for a while, but then it would ease up. I mean, I take Tylenol because I don't want to take no painkillers or anything, I'm just scared I might get addicted or something and that's something I don't want to do.

(By Attorney)

Q      How long can you sit before you need to, to take a break from sitting?

A      About a half hour, maybe 45 minutes.

Q      And do you have any problems standing?

A      Yes, Ma'am, it's hard because of the surgery I had on my left foot and with the sciatica, it hurts after standing for awhile. Like I don't go to the stores and go grocery shopping anymore. My aunt and my husband goes to do that, you know, she'll go with him and help him do the shopping, but –

Q      How long can you –

ALJ    Are you able to walk without a cane or –

Clmt   Sometimes, sometimes I am, You Honor, and sometimes I'm not. It just, like the weather when we had this storm come in, my back really hurt and my foot hurt, but I didn't go nowhere. And now like today, you know, it hurts, but, you know, I push myself to try to make it better.

(By Attorney)

Q      How long can you stand before you need to get off your feet?

A      Maybe 15, 20 minutes.

Q      And what, how much are you able to lift?

A      Oh, I usually don't life anything anymore. I mean, maybe a gallon of milk or, you know, something like that, but I don't do a lot of, again, my aunt does a lot of my housework for me and, you know, like when she does my laundry, she'll bring in

|     |     |
| --- | --- |
| | the basket and I'll sit and fold the clothes and things like that, but as far as something to be ironed, she'll do that or, you know, I try and help her dust and, you know, things like that. But as far as the heavy work, I don't, because I don't want to be in the pain. I, you know, try and avoid that as much as I can. |
| Q | Do you ever have to lay down during the day because of pain? |
| A | Oh, yes, yes, ma'am. |
| Q | Between the hours of 9:00 and 5:00, how much time do you think you spend laying down for pain? |
| A | About two to three hours. |
| ALJ | Do we have a current physical CE? |
| Atty | We don't. I don't believe, Your Honor, that there have been any. Before I say that, let me check. I don't believe she's ever had any CEs performed. |
| ALJ | Okay. I think we need one. I'm going to verify that this is, that she has also applied for SSI at the same time. I have conflicting information, and if she has, I think we need to get both, a physical and a mental CE. |
| Atty | Right. I – |
| ALJ | (inaudible) a comprehensive medical source statement about for either? |
| Atty | No, there hasn't been, and when I got a copy of hte CD mailed to me, I reviewed it, and from what I could see, I was under the impression that it was just a Title II application. So I, asked Ms. Martell to go to Social Secuirty and apply for SSI, which she did on November 18th, and |
| ALJ | Of which year? Of this year? |
| Atty | Yes. And she asked – |
| ALJ | Is that indicated? Did they say they had an application pending? |
| Atty | They didn't, I don't believe they did, but they said that they would escalate that SSI application to the hearing office, I mean, to the hearing level so the cases could be consolidated. |
| ALJ | Okay. I will check that out. |
| Atty | Okay. |
| | *          *          *          *          * |
| Atty | I don't have any more questions, Your Honor. |
| | *          *          *          *          * |

(The Vocational Expert, DR. ANDREW BEAL, having been first duly sworn, testified as follows:)

Examination of Vocational Expert by Administrative Law Judge:

|     |     |
| --- | --- |
| Q | Dr. Beal, can you tell me about her past work? |
| A | Yes, ma'am. Based on my review of the exhibits, she has worked as a fast food worker which would be unskilled and light. She worked as a server/waitress at a donut shop. That type of work is low level, semi-skilled with an SVP of 3 and light. And she worked in Goodwill, sorting clothing. That would be unskilled and light work. |

Q       Okay. I'm going to try and cover the waterfront with the question, and again, this
        is probably relevant to now it is a Title II application, but we'll try to cover, I will
        try to ask enough questions so that we don't have to get back together here.

Atty    Okay

(By Administrative Law Judge)

Q       Anyway, would you please consider a person capable of medium work as defined
        by the Social Security Administration, but has difficulty concentrating and would
        need reminders to stay on task. Are there any medium jobs that she could do?

A       Unskilled, Your Honor, unskilled medium occupations, for example, work as a
        cleaner. Someone who would work in a hospital, for example. In the tri-state;
        West Virginia, Maryland, Pennsylvania area, there are approximately 59,000
        positions such as that; in the national economy, there are approximately four and
        a half billion medium level cleaning positions. In laundry, you have people who
        check in laundry. At the medium level, there are approximately 1600 positions
        such as that in the tri-state area, and over 122,000 in the national economy. There
        are food service workers, people who wash dishes, carry food to patients on
        floors. In the tri-state area, there are approximately 343,000 such positions. These
        positions being unskilled, there will be supervisors now, that will give
        instructions, but if they required constant reminders, I don't think that would be
        allowable.

Q       okay. How about let's assume that we're talking about instructions, but now I
        want to add another restriction. If she needed a sit/stand option, would she be able
        to do those jobs?

A       No, Ma'am. Generally medium work is clarified that they're supposed to be on
        their feet six hours out of an 8-hour day.

Q       Okay. Let's go back to the light RFC. Assume she can do light work as defined
        by the Social Security Regulations, but she, she needs to understand work. She
        needs, and she needs a sit/stand option. Let's, first, she just needs unskilled work.
        Could she do any of her past work?

A       Yes, she could do her fast food work. She could do her work as a sorter, yes.

Q       Okay. Now, we said she had one past job that was semi-skilled. Were there
        transferable skills?

A       No, ma'am. Work as a waitress, like I said, that was low level, SVP 3 work and I
        don't think she acquired any significant marketable skills there.

Q       Okay. Okay. Can you give me some other light jobs taht she could do? And then
        I'm going to add to that hypothetical also.

A       Yeah, she could work as a parking garage attendant, someone who sits in a booth
        and monitors people in the parking garage. There are approximately 3400 such as
        that in the tri-state area; 198,000 in the national economy. Others would be
        positions as a counter clerk. That would be unskilled, light level. There are
        approximately a hundred–excuse me, 4100 positions in the tri-state area; and in
        the national economy, there are approximately 180,000 such positions. There
        would be work as a mail sorter, a nongovernmental mail sorter. There are

approximately 8000 positions such as that in the tri-state area; and in the national economy, approximately 167,000 such positions.

Q     Okay. Now, if we add to that –well, these are unskilled?

A     Yes, ma'am.

Q     We've accounted for the concentration problem. If we added a sit/stand option, would she be able to do any of those?

A     Yes, sir, I think – yes, ma'am, I think all of these (inaudible) some opportunity to change position, so long as they can stay at the work station for generally two hours at a time without taking a break.

Q     Okay. Let's go down to the sedentary level, and then I'm going to, I'll add some more restrictions. If she can do sedentary work as defined by Social Security Act would she be able to do any of her past work?

A     No, none of her previous work (inaudible).

Q     Okay. Are there other jobs that she could do?

A     Yes, there would be.

Q     Let's, let's add the sit/stand option to it. So if we don't need a sit/stand option, she would be able to do them also?

A     Well, I think there would be cashiering jobs that she could do. Work as a food checker or check casher types of work. There are approximately 19,000 sedentary positions similar to that in the tri-state area; over a million nationally. Other jobs as an inspector. Someone who visually inspects items or defects. There are approximately 1100 sedentary positions such as that in the tri-state area; 55,000 in the national economy. Other work, hand working occupations as a packer or packager. There are approximately 2400 positions such as that in the tri-state area; and 73,000 in the national economy. And these jobs do afford the worker the opportunity to occasionally change position so long as they could remain at the work station and remain (inaudible). But if you were required to take a break more frequently, let's say, every two hours, that generally is not going to be tolerated.

Q     Okay. Now, I'd like to give you her RFC. She can, she can stand for only 15 to 20 minutes at a time. She can sit for 30 to 45 minutes at a time. So she still needs a sit/stand option more often than the usual 30-minute sit/stand option like I was referring to before. But she, she will need a sit/stand option every, at least every 20 minutes. And she can lift five pounds frequently and occasionally. Are there any jobs that she could do?

A     Well, the weight limitation is going to restrict her to sedentary work.

Q     All right.

A     If she could sit for 30 to 45 minutes and then just needed to stand briefly and she could return to a seated position, I think she could do that.

Q     Okay.

A     But if she needed to stand up for 15 or 20 minutes and then sit down for 30, I think that probably would be impractical.

Q     Okay. So if we're talking about standing and changing positions for just momentarily to get some relief, could she do the sedentary jobs that you named?

| A | Yes. I believe so. |
|---|---|
| Q | Now, what if she were going to miss two days a week because of depression, would she be able to do any of hte jobs that you've named? |
| A | No, ma'am. That would greatly exceed customary tolerances, according to the Department of Labor for LLD employees, and this is where she would fall, anyone who misses more than a day and a half a month, that's considered to be excessive. So this (Inaudible) would not allow for it, it's the same type of activity competitive work is going to require. |
| Q | And assuming that she said some days she needs to take a break of two hours to sleep, would she be able to do any of these jobs? |
| A | Not at this time for any regular basis, no. |

        *          *          *          *          *

(The hearing concludes at 1:48pm, on December 12, 2008).

E.      <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect her daily life:

- stopped working because of heart palpitations at work (Tr. 111)
- both parents died in 2001 (Tr. 111)
- has difficult time breathing, can't stand a long time, broke foot in three places (Tr. 111)
- completed associate degree in bookkeeping (Tr. 117)
- able to clean the house and make dinner (Tr. 132)
- takes friends to doctors (Tr. 133)
- Cannot sleep good at night without sleeping pill (Tr. 133)
- Husband helps her in and out of the tub due to her foot (Tr. 133)
- Cannot stand long periods at a time (Tr. 134)
- Tries to clean inside of house all day, once every 2 weeks(Tr. 134)
- Can drive a car (Tr. 135)
- Goes shopping once a month, for 1 hour (Tr. 135)
- Able to pay bills, count change, use checkbook (Tr. 135)
- Not able to handle a savings account (Tr. 135)
- Used to love outdoors, but now is paranoid and depressed (Tr. 136)
- Has problems getting along with family, friends and neighbors (Tr. 137)
- Does not like to be around people anymore (Tr. 137)
- Impairment affected her lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, memory, completing tasks, concentration, getting along with others (Tr. 137)

- Does not handle stress well at all (Tr. 138)
- Uses a cane, brace/splint (Tr. 138)
- Numerous references to Claimant's depression (Tr. 145, 254)
- Antidepressant and sleeping medications was increased (Tr. 145)
- Suicide attempt (Tr. 146)
- Increasing severity of Claimant's COPD (Tr.29)
- Numerous references to Claimant's smoking habit (Tr. 29)
- Loss of 11 family members within a couple of years (Tr. 27-29)
- Death of her son in 1994 (Tr. 27)
- Affect flat/blunted, irritable, depressed, panic attacks (Tr. 252)
- Raped 9 years ago (Tr. 247)
- Physical, sexual, and emotional abuse suffered as a child (Tr. 247)
- Break with daughter (Tr. 247)
- Cites to assistance of daughter and her family as major supporters (Tr. 30)
- Keeps trying to cut down on her smoking (Tr. 30)
- Fracture of left ankle/foot causing difficulty in walking (Tr. 240)

### III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence because the ALJ indicated she gave significant weight to the opinions of Mr. Hood and Dr. Tuwiner but failed to include those limitations in both the ALJ's residual functional capacity assessment ("RFC") and in the hypothetical provided to the vocational expert ("VE"). Claimant also argues the ALJ failed to comply with Social Security Ruling 00-4p by not ensuring that the VE's testimony was consistent with the Dictionary of Occupational Titles ("DOT"). Claimant argues that an examination of the DOT does not support the jobs definitions, as identified by the vocational expert as sedentary and unskilled.

Commissioner contends the evidence of record supports the ALJ's finding that Claimant had the residual functional capacity to perform sedentary unskilled work. Commissioner argues, in

footnote on page 15 of his Motion, that the hypothetical presented to the VE was not defective because the VE was present at the hearing and was aware of Claimant's age and educational history. Commissioner further argues Claimant's attempt to discredit the VE's testimony before the Court is unwarranted because Claimant had an opportunity to cross-examine the VE regarding the inconsistencies and declined to do so.

In Claimant's Reply, Claimant argues the Court may not consider the *post hoc* justifications proffered by the Commissioner's attorney. Claimant argues that the ALJ was under an obligation to explicitly indicate the weight she gave to the medical evidence and provide reasons for her choices in weighing the evidence. Claimant contends SSR 00-4p is unambiguous and was not complied with because the ALJ failed to inquire of the VE whether the VE's testimony was consistent with the DOT as required.

B.    Discussion

### 1. Whether the ALJ Properly Included the Limitations Noted by Mr. Hood & Dr. Tuwiner in the ALJ's RFC Assessment and in the Hypothetical Provided to the VE

Claimant argues the ALJ's decision was in error because the ALJ did not include Claimant's limitations in both the RFC assessment and the VE hypothetical. Claimant contends that Mr. Hood's noted limitations that Claimant had moderate limitations in her ability to work with the public, supervisors and coworkers and respond to changes in the work setting, and Dr. Tuiwner's noted limitations that Claimant would have occasional manipulative limitations in reaching were overlooked by the ALJ.

Commissioner argues the ALJ's RFC assessment was proper and included further restrictions than what was described by Dr. Tuwiner. Commissioner contends the ALJ was not required to include work-related limitations into the RFC because those limitations were not

supported by Claimant's medical record. Commissioner further contends the record of treatment, as evident in Claimant's GAF scores, showed no more than slight impairment of social functioning.

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3) (2010). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

A Residual Functional Capacity is what a claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945 (West 2010). The Residual Functional Capacity assessment is based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of a claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons of claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a claimant from performing particular work activities.

Id.  The ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact.  20 C.F.R. § 416.946.

The Fourth Circuit Court of Appeals has held an ALJ is not required to include work-related limitations into a residual functional capacity assessment when those limitations are not supported by the record.  Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986).  Additionally, while questions posed to the vocational expert must fairly set out all of the Claimant's impairments, the questions need only reflect those impairments supported by the record. Russell v. Barnhart, 58 Fed. Appx. 25, 30; 2003 WL 257494, at 4 (4th Cir. Feb. 7, 2003)[5].  The Court further stated that the hypothetical question may omit non-severe impairments but must include those that the ALJ finds to be severe.  Id.   Moreover, based on the evaluation of the evidence, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ."  France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)).

The ALJ is afforded "great latitude in posing hypothetical questions."  Koonce v. Apfel,[6] 166 F.3d 1209; 1999 WL 7864, at 5 (4th Cir. 1999) (citing Martinez, 807 F.2d, at 774).  The ALJ need only pose those questions that are based on substantial evidence and accurately reflect the

[5]  This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

[6] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

Claimant's limitations.  Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988); see also

Hammond v. Apfel,[7] 5 Fed. Appx. 101,105; 2001 WL 87460, at 4 (4th Cir. 2001).

Here, the ALJ posed the following hypothetical question to the VE:

> Okay. Now, I'd like to give you her RFC. She can, she can stand
> for only 15 to 20 minutes at a time. She can sit for 30 to 45
> minutes at a time. So she still needs a sit/stand option more often
> than the usual 30-minute sit/stand option like I was referring to
> before. But she, she will need a sit/stand option every, at least
> every 20 minutes. And she can lift five pounds frequently and
> occasionally. Are there any jobs that she could do?

(Tr. 51-52).

To this, the VE listed possible employment as a food or check cashier, an inspector, and packer.

(Tr. 51).  The VE followed up his answer, however, by stating "if she needed to stand up for 15

to 20 minutes and then sit down for 30, I think that probably would be impractical." (Tr. 52). The

ALJ then asked the VE "so if we're talking about standing and changing positions for just

momentarily to get some relief, could she do the sedentary jobs that you named?" (Id.). The VE

responded affirmatively.  The ALJ then posed to the VE "Now, what if she were going to miss

two days a week because of depression, would she be able to do any of the jobs that you've

named?" The VE stated "No, ma'am. That would greatly exceed customary tolerances,

according to the Department of Labor...anyone who misses more than a day and a half a month,

that's considered to be excessive." (Id.). The ALJ then asked the VE "assuming that she said

some days she needs to take a break of two hours to sleep, would she be able to do any of these

jobs?" (Tr. 52-53).  The VE responded negatively.

---

[7] This Court recognizes that the United States Court of Appeals for the Fourth Circuit
disfavors citation to unpublished opinions.  I recognize the reasons for that position and
acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in
this regard.

The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)).  The ALJ's decision must be upheld if it is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3).  Although a voluminous record, the Court finds Claimant's concern as to the absence of Claimant's age and education level in the posed hypothetical is harmless error. See Shinsecki v. Sanders 129 S. Ct. 1696 (2009) (citing Nelson v. Apfel, 131 F.3d 1228, 1236 (7th Cir. 1997)). Here, the VE was present for the entire hearing and testified he had reviewed the exhibits in Claimant's record. (Tr. 48).  Claimant's record is replete with references to her date of birth as well as her educational level. It is the Claimant's burden to prove how she was harmed. Therefore, this argument must fail.

Claimant's contention that the ALJ failed to include the limitations found by Mr. Hood and Dr. Tuwiner in the ALJ's RFC determination is without merit.  Regarding Mr. Hood's exam of Claimant, the ALJ states "Mr Hood indicated that the claimant had no more than *moderate limitations in her ability to perform work related functions*. (Tr. 19) (emphasis added).  Relative to Dr. Tuwiner's exam, the ALJ states "[b]ased on the examination, the claimant has no limitations in sitting, can stand/walk up to four hours overall in an eight hour workday, lift up to ten pounds occasionally with frequent lifting up to five pounds and *can reach overhead only occasionally*. Postural limitations were also noted." (Tr. 19) (emphasis added).  The ALJ considered the opinions but explained why she did not accord controlling weight to Dr. Tuwiner's and Mr. Hood's opinions. (Tr. 20).  The ALJ specifically explains her reasoning in keeping with her duty under SSR 96-8p.  The ALJ found Claimant to be "totally independent in

all activities of daily living," "able to care for her home and herself as well as assisting others with their activities of daily living." (Id.). The ALJ continued by explaining "[c]laimant's subjective complaints are out of proportion to and not supported by objective medical evidence and clinical findings." (Id.). "While the claimant's impairments are severe in that they have more than a minimal affect on her ability to function, they are not totally disabling and do not preclude the performance of all substantial gainful activity." (Id.).

While questions posed to the vocational expert must fairly set out all of the Claimant's impairments, the questions need only reflect those impairments supported by the record. Russell v. Barnhart, 58 Fed. Appx. at 30 (4th Cir. Feb. 7, 2003)[8]. The ALJ is not bound by the conclusions of Dr. Tuwiner and Mr. Hood and appropriately explained the reasoning behind the weight she afforded to the opinions. A claimant's RFC is reserved for the ALJ. Therefore, Claimant's second argument must also fail.

### 2. Whether the ALJ Properly Ensured Against Any Inconsistencies Between the DOT and VE's Testimony as Required Under Social Security Ruling 00-4p

Claimant also argues that the jobs listed by the VE conflict with the descriptions in the DOT and the ALJ erred by failing to obtain a reasonable explanation for the apparent conflict as required by SSR 00-4p. Commissioner argues remand for additional vocational expert testimony is not warranted because Claimant forfeited her right to raise any inconsistencies because her previous attorney did not raise them at the hearing. (Tr. 53).

Ruling 00-4p clarifies the standards for use of vocational experts who provide evidence

---

[8]   This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

at hearings before the presiding administrative law judge.  SSR 00-4p, 2000 WL 1898704, at 1

(S.S.A.).  The "ruling emphasizes that before relying on VE . . . evidence to support a disability

determination or decision, our adjudicators must: identify and obtain a reasonable explanation

for any conflicts between occupational evidence provided by VEs . . . and information in the

Dictionary of Occupational Titles . . . ."  Id.  The ALJ has an affirmative duty to ask about any

possible conflict between the VE testimony and the information provided in the DOT.  Id. at 4.

The adjudicator must ask if the evidence provided conflicts with the DOT information and obtain

a reasonable explanation for any conflict.  Id.  When there is an apparent conflict, the ALJ must

elicit a reasonable explanation for the conflict before relying on the VE's evidence and testimony

to support a disability determination.  Id. at 2.

Ruling 00-4p is satisfied "'by the ALJ simply asking the VE if his testimony is consistent

with the DOT.'"  Street v. Commissioner of Social Sec., 2010 WL 13476205, at 5 (E.D. Mich.

2010) (citing Martin v. Comm'r of Social Sec., 170 Fed.Appx. 369, 374-75 (6th Cir. 2006)).  If

the ALJ asks the VE if a conflict exists and the ALJ denies, the ALJ's duty ends.  Martin, 170

Fed.Appx. at 374; see also, Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009) (stating that "SSR

00-4p requires the ALJ to obtain an explanation only when the conflict between the DOT and the

VE's testimony is 'apparent'") .  The claimant may bring the VE's mistake to the ALJ's

attention, but "[n]othing in SSR 00-4p places an affirmative duty on the ALJ to conduct an

independent investigation into the testimony of witnesses to determine if they are correct."  Id.

(finding that "[b]ecause [the claimant] did not bring the conflict to the attention of the ALJ, the

ALJ did not need to explain how the conflict was resolved.").

The Court finds Prochaska v. Barnhart, 454 F.3d 731 (7th Cir. 2006) instructive.  In

Prochaska, the court vacated the district court's judgment upholding the Commission's decision and remanded the case so that the ALJ could determine whether the job requirements identified by the vocational expert were, in fact, consistent with the definitions in the DOT and the claimant's limitations. The court determined that while the ALJ took testimony from an expert as to whether certain job requirements were compatible with the claimant's various limitations, the ALJ did not ask whether the expert's analysis conflicted with the DOT. Id. at 735. The court emphasized that "the language of SSR 00-4p unambiguously sets out the ALJ's affirmative duty...to inquire about conflicts between vocational expert testimony and the DOT." Id. It found that the claimant was "not required to raise this issue at the hearing because the Ruling places the burden of making the necessary inquiry on the ALJ." Id.

Upon review of the hearing transcript, the Court did not find, nor did Commissioner reference, any inquiry by the ALJ regarding possible inconsistencies between the VE's testimony and the DOT. Claimant, here, argues that each job identified by the VE cannot be done by an individual who is limited to sedentary unskilled work, given the definitions provided in the DOT. The determination of any inconsistencies should have been made by the ALJ in the first instance, and her failure to do so should have been identified and corrected by the Appeals Council. We will defer to an ALJ's decision if it is supported by "substantial evidence," but here there is an unresolved potential inconsistency in the evidence that should have been resolved." Id. at 736. Accordingly, the Commissioner's decision should be remanded for the determination of whether the VE's testimony is consistent with the definitions in the DOT and Claimant's limitations.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **GRANTED IN PART AND DENIED IN PART** as follows: It should be **GRANTED** for a determination whether the VE's testimony is consistent with the definitions in the DOT and Claimant's limitations.  It should be **DENIED** because Claimant's RFC is reserved for the ALJ.

2.      Commissioner's Motion for Summary Judgment be **GRANTED IN PART AND DENIED IN PART** for the same reasons.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: September 21, 2010

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE